### In re WISCONSIN BARGE LINE, INC., et al, Debtors.

#### Bankruptcy No. 86-00016(SE).

United States Bankruptcy Court,
E.D. Missouri,
Southeastern Division.

July 29, 1987.

Gregory D. Willard, St. Louis, Mo., for Debtors.

Henry F. Luepke, Jr., Mary Caola Kullman, St. Louis, Mo., for Mercantile Bank.

Norman W. Pressman, Clayton, Mo., for Northwestern Mut. Life Ins. Co.

Dean S. Cooper, Dept. of Justice, Washington, D.C.

Robert S. Goldenhersh, Stuart J. Radloff, Clayton, Mo., for Creditors' Committee.

David A. Lander, St. Louis, Mo., for Continental Bank.

Lloyd A. Palans, Clayton, Mo., for Centerre Bank.

Steven N. Cousins, St. Louis, Mo., for Mobil Corp.

## MEMORANDUM OPINION

DAVID P. McDONALD, Bankruptcy Judge.

### INTRODUCTION

On July 2, 1987, the Court entered an Order granting the Motion Of Debtors For Order Pursuant To 11 U.S.C. Section 1121(d) To Extend The Period Within Which Debtors May Have Plan Accepted and overruling the Secured Creditors' Joint Objection To Debtors' Motion.[1] On July 13, 1987, the Secured Creditors filed a Notice of Appeal and Joint Motion To District Court For Leave To Appeal Interlocutory Order. On July 23, 1987, the Debtors filed a Memorandum And Answer In Opposition To Secured Creditors' Joint Motion For Leave To Appeal Interlocutory Order. This Memorandum sets forth the findings upon which the Court's Order extending the Debtors' exclusive period was based.

---

1. The objections of the secured creditors were filed by Mercantile Bank, N.A. ("Mercantile"), the United States of America on behalf of the Maritime Administration ("MARAD") of the Department of Transportation, and Northwestern Mutual Life Insurance Company ("Northwest-

### FINDINGS OF FACT

1. On January 13, 1986, Wisconsin Barge Line, Inc. ("Wisconsin"), CLC of America, Inc. ("CLC"), CLC Barge Line, Inc. ("CLC Barge"), Reidy Terminal, Inc. ("Reidy"), and New Orleans Shipyard, Inc. ("Shipyard") filed their voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.

2. On January 13, 1986, the Court ordered these cases jointly administered.

3. These cases constitute the largest single bankruptcy filing in the history of this judicial district. A review of the Court file reveals a case of great magnitude and complexity as measured by the volume and intensity of the litigation; the hundreds of creditors, stockholders and employees; and, the hundreds of millions of dollars in assets and liabilities. To date there have been 694 proofs of claim filed aggregating over $300,000,000.

4. Wisconsin, CLC Barge, Reidy and Shipyard are wholly owned subsidiaries of CLC. The operations of these corporations are extensive and cover much of the midwest and Gulf ports. Wisconsin is a carrier of bulk non-regulated commodities on the Mississippi, Illinois, Ohio and Tennessee river systems, operating a fleet of over 500 barges. Its primary terminus of operations is located at Belmont, Missouri. CLC Barge owns 24 barges, which are chartered to Wisconsin. It leases approximately 6,200 feet of river property north of New Orleans which is subleased to Shipyard. The Shipyard is located on the lower Mississippi River and repairs inland marine equipment. Reidy is located on six acres of land it owns on the Mississippi River near St. Louis, Missouri. It operates a liquid bulk storage, midstream fuel service and barge repair terminal.

5. Since the inception of these cases, the Debtors have been embroiled in continuous litigation on numerous issues. (See docket sheets attached hereto as Appendix A.*) In terms of numbers alone, there

---

ern"), each holding both secured and unsecured claims.

\* Editorial Note: Appendices omitted by Court for purposes of publication.

have been over 100 contested matters and more than a dozen adversary proceedings commenced by and against the Debtors. *See*, for example, *In re Wisconsin Barge Line, Inc.*, 63 B.R. 40 (Bankr.E.D.Mo.1986); *In re CLC of America, Inc.*, 68 B.R. 512 (Bankr.E.D.Mo.1986); *In re Wisconsin Barge Line, Inc.*, 69 B.R. 16 (Bankr.E.D. Mo.1986). To mention but a few specific examples, Wisconsin has had to negotiate with several unions concerning collective bargaining agreements since the filing of these Chapter 11 cases, and has sought and received rulings from the National Labor Relations Board. The Debtors have also rejected certain executory contracts which resulted in disputed claims and extensive litigation. In particular, the rejection of an executory contract with Slay Warehousing Co. resulted in lengthy negotiations and litigation involving a claim of over $30,000,-000.

6. Debtors' attorneys have expended over 8,000 hours working on these matters and in the Court's view they have at all times conducted their representation in an extremely competent, conscientious and professional manner and have administered these cases with due diligence.

7. Notwithstanding the tremendous volume and complication of these cases, on May 4, 1987, less than sixteen months following the filing of the petitions, Debtors filed their disclosure statement and joint plan of reorganization. Therefore, the Debtors are not seeking additional time to file a plan, but simply an extension of the exclusive period for obtaining the required consents to the plan of reorganization, as contemplated by the Code. The Debtors' Joint Disclosure Statement and Plan of Reorganization consist of 75 pages and 29 pages respectively, along with lengthy exhibits (see Debtors' Joint Disclosure Statement and Debtors' Joint Plan of Reorganization attached hereto as Appendix B).

8. On May 22, 1987, Debtors filed a motion to extend the exclusive period for obtaining acceptances of their plan. Debtors had previously moved for and had been granted four extensions of the exclusive period. Although creditors, Mercantile Trust Company, N.A., the United States of America on behalf of the Maritime Administration, and the Northwestern Mutual Life Insurance Company had in the past not objected to all such extensions, having been willing to give the Debtors time to put their plan together, they did object to the fifth extension. On July 2, 1987, the Court granted Debtors' motion for an extension of the exclusive period and overruled the creditors' objection thereto.

9. Any of the foregoing findings of fact deemed to be conclusions of law are hereby incorporated into the Conclusions of Law.

**CONCLUSIONS OF LAW**

1. This Court has jurisdiction over the parties and subject matter of this proceeding pursuant to 28 U.S.C. §§ 1334, 151, and 157 and Local Rule 29 of the United States District Court for the Eastern District of Missouri. This is a "core proceeding" pursuant to 28 U.S.C. § 157(b)(2)(A), which the Court may hear and determine.

2. Under Title 11, Section 1121(d), the Court for cause may extend the exclusive period within which a debtor may obtain acceptances of its plan.

3. The Bankruptcy Code does not define "cause" for purposes of granting an extension of the exclusive period. The legislative history of Title 11, Section 1121(d), however, does offer some guidance. As the House Report states, "if an unusually large company were to seek reorganization under Chapter 11, the court would probably need to extend the time in order to allow the debtor to reach an agreement." H.R. Rep. No. 95–595, 92 Cong., 2d Sess. 232, *reprinted in* 1978 U.S.Code Cong. & Admin.News 5787, 6191. Congress clearly recognized the need to provide the Court with authority to grant extension of the exclusive period for cause. If such an extension were not allowed, it would be virtually impossible for major corporations that are faced with extensive and time consuming litigation, such as these Debtors, to ever enjoy the exclusive benefits provided by 11 U.S.C. § 1121. Given that this is an extremely large and complex case where the Debtors have acted with diligence and have already filed a plan capable of confirmation, the Court concludes that Debtors'

have shown cause for the granting of this extension of the exclusive period. *See generally, In re Perkins,* 71 B.R. 294 (W.D. Tenn.1987); *In re Texaco, Inc.,* 76 B.R. 322 (Bankr.S.D.N.Y.1987) (attached as Appendix C).

4. The foregoing Findings and Conclusions are based upon the record as a whole.

5. Any of the foregoing conclusions of law deemed to be findings of fact are hereby incorporated into the Findings of Fact.